**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**VS.**                                          **CASE NO: 6:09-cr-142-Orl-36GJK**

**LUIS A. GONZALEZ-CASTRO**

---

## ORDER

This cause comes before the Court on the Report and Recommendation of Magistrate

Judge Gregory J. Kelly (Doc. 80).  Following an evidentiary hearing held on April 15, 2013,

Magistrate Judge Kelly recommends that the Court grant Defendant Luis A. Gonzalez-Castro's

("Defendant") Motion to Dismiss the Indictment ("Motion to Dismiss") (Doc. 63).  *See* Doc. 80.

On May 17, 2013, the Government filed Objections to the Report and Recommendation

("Objections") (Doc. 85), to which Defendant responded ("Response") (Doc. 88).  As such, this

matter is ripe for review.

## I.    BACKGROUND

On July 22, 2009, a grand jury returned an indictment charging Defendant with one count

of knowingly making false statements and representations in connection with the purchase of

two firearms from a federally licensed firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A).

*See* Doc. 1, pp. 1–2.  The indictment alleges that on or about October 25, 2007, Defendant

represented on a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Form 4473 that

he was purchasing the firearms for himself, when in fact he was knowingly purchasing them for

a convicted felon, William Rafael Tejada ("Mr. Tejada").  *Id.*[1]  In other words, this is an illegal

---

[1] The indictment also charged Mr. Tejada with one count of knowingly possessing and receiving
firearms and ammunition as a convicted felon.  *Id.* at 2.  Mr. Tejada was arrested on July 30,

straw purchase case, which has been described by the Government as "lying and buying." *See* Transcript of Evidentiary Hearing ("Tr."), Doc. 90, pp. 10–11.

More than three years later, on November 5, 2012, the Court issued an Order directing the Government to show cause why the case should not be dismissed for lack of prosecution ("Order to Show Cause"). *See* Doc. 52. On November 16, 2012, the Government filed a Fugitive Status Report stating:

> Since the issuance of the arrest warrant, ATF repeatedly has attempted to locate the defendant at locations in both the continental United States and Puerto Rico. To date, these efforts have not been successful. Periodic database checks at six-month intervals also have failed to develop new leads as to the defendant's whereabouts. . . . In early November 2012, however, ATF learned new information regarding a potential location of the defendant. Efforts currently are underway to ascertain whether the defendant is at this location. ATF remains confident that the defendant will be apprehended shortly through their continuing efforts.

Doc. 53, ¶¶ 2–3. On February 13, 2013, Defendant was arrested, arraigned before Magistrate Judge David A. Baker, and released on supervision. *See* Doc. 56.

On February 18, 2013, Defendant filed the Motion to Dismiss, arguing that his Sixth Amendment right to a speedy trial had been violated. *See* Doc. 63. Magistrate Judge Kelly held an evidentiary hearing on the Motion to Dismiss. *See* Doc. 79. The Government presented testimonial evidence from ATF agents Tim Gunning ("Agent Gunning") and Julian Blanco ("Agent Blanco"), and Defendant presented testimonial evidence from Nellie Perez ("Ms. Perez"). *See id.*

Agent Blanco testified that in November 2007 he became involved in an ATF investigation of Defendant for illegal straw purchasing. *See* Tr. 54. On November 6, 2007, Agent Blanco and other investigators visited Defendant at his mother's residence at 135 White

---

2009, and was later convicted after entering a guilty plea and sentenced to an 18-month term of imprisonment. *See* Docs. 8, 35, 45.

Birch Drive in Kissimmee, Florida, where Defendant was residing at the time.[2]  *Id.* at 41, 54, 59–

60.   Defendant's mother and stepfather were also present.   *Id.* at 60.   During the visit, Agent

Blanco informed Defendant that he had violated federal law by making illegal straw purchases

for Mr. Tejada, and that Defendant was under investigation.   *Id.* at 55.   Defendant admitted that

he had purchased the firearms for Mr. Tejada.   *Id.* at 15.   Agent Blanco did not arrest Defendant,

but made no promises to him regarding the possibility of future prosecution.   *Id.* at 54–55.

Defendant agreed to cooperate with the Government by helping to develop additional

information regarding other firearms violations, with the understanding that the United States

Attorney's Office would be informed about Defendant's cooperation.   *Id.* at 55–56.   Agent

Blanco and Defendant exchanged contact information at the conclusion of the meeting.   *Id.* at

56–57.

Between November 2007 and January 2008, the ATF attempted to send Defendant a

notice of forfeiture regarding the firearms at issue in this case by mailing the notice to 135 White

Birch Drive, but the mailing was returned to the ATF as unclaimed.[3]  *Id.* at 16–17.   Agent Blanco

testified that on February 5, 2008, he again met with Defendant at 135 White Birch Drive to

personally serve Defendant with the notice of forfeiture, and that Defendant again expressed

interest in cooperating with Agent Blanco.   *Id.* at 57.   Agent Blanco stated that from November

2007 through the spring of 2008, he attempted to call Defendant at least five times at the

telephone number he had for Defendant, left voice messages at that telephone number, and left a

business card at the residence on White Birch Drive, but Defendant did not contact him.   *Id.* at

---

[2] Defendant told investigators that he had also been staying with his brother at the Heritage Hotel
in Orlando.  *Id.* at 37, 63.

[3] Agent Gunning testified that the notice of forfeiture only provided information as to how
Defendant could make a claim for the firearms and ammunition subject to forfeiture.  Tr. 17–18,
38–39.

58–59.  Agent Blanco was transferred from the ATF's Orlando office to its Tampa, Florida office in the spring of 2008.  *Id.* at 58.

Agent Gunning testified that in November 2008, he assumed responsibility, as the case agent, in the investigation of Defendant.  *Id.* at 11.  In addition to being the case agent on this investigation, Agent Gunning stated that he was the case agent for 20 to 25 other investigations at the time, and that he also had responsibilities with the ATF as a firearm instructor coordinator, interstate nexus expert, digital collection specialist, vault custodian, and acting group supervisor for between 100 and 150 investigations.  *Id.* at 7, 30.  Agent Gunning further testified that he spoke with Agent Blanco about the investigation of Defendant, and he understood from this conversation that Defendant had at one time admitted to his role in the straw purchase.  *Id.* at 14–15.  Agent Gunning also understood that Defendant had at one point been cooperating with the Government, but that he was no longer cooperating as he had failed to keep in contact with Agent Blanco.  *Id.* at 15.  The address listed for Defendant in the case file was his last known residence at his mother's house at 135 White Birch Drive.  *Id*.

On July 22, 2009, Defendant was indicted in connection with the straw purchase and an arrest warrant was issued.  *See* Docs. 1, 2.  Agent Gunning testified that at this point, he made the tactical decision to pursue Defendant covertly, because Defendant was no longer cooperating with the Government and had created a "potential adversarial situation."  Tr. 21–22.  Agent Gunning also testified that there was a "level of mistrust" of Defendant because he had provided misleading information during the initial investigation regarding the location of the firearms.  *Id.* at 22.  Based on these circumstances, Agent Gunning believed that the safest action was to make a surprise arrest to prevent Defendant from preemptively arming himself.  *Id.* at 21–22.

Immediately after the issuance of Defendant's arrest warrant, the warrant was entered into the National Crime Information Center ("NCIC") database, which is a database that law enforcement personnel throughout the United States use to determine whether an individual they have stopped has an outstanding arrest warrant. *Id.* at 22–23. However, the ATF never received any notifications through the NCIC database as to Defendant's whereabouts. *Id.* at 23. In November 2009, the ATF requested a wage and earnings evaluation with respect to Defendant. *Id.* A wage and earnings evaluation is a tool used by the ATF to determine whether an individual is currently employed and the location of such employment.[4] *Id.* at 23–24. The wage and earnings evaluation stated that the latest information reported for Defendant was in the second quarter of 2007, meaning that since that time, Defendant had not been working at an employer that reported income. *Id.* at 24.

Also, in November 2009, Agent Gunning called what he believed to be Defendant's phone number, which Defendant had provided on the Form 4473 used to make the straw purchase, but Defendant did not answer. *Id.* at 25–26. That same month, Agent Gunning conducted a query on the Accurint database, which is a database subscribed to by law enforcement that allows the user to search public records, including contact information, of a given individual. *Id.* at 27–28. The query returned the 135 White Birch Drive address, as well as an address associated with Defendant in Puerto Rico, where he had previously lived. *Id.* at 26–28. Agent Gunning, suspecting that Defendant may have returned to Puerto Rico, contacted the ATF's Puerto Rico office and asked if agents there could attempt to locate Defendant. *Id.* Following the initial conversation, however, no one from the ATF's Puerto Rico office ever contacted Agent Gunning with information regarding Defendant's whereabouts. *Id.* at 28.

---

[4] Agent Gunning testified that the ATF prefers to arrest a suspect at his workplace rather than at his home because the suspect is less likely to have access to weapons at his workplace. *Id.* at 25.

Agent Gunning further testified that on four occasions between January 2010 and April 2010 he conducted surveillance on the 135 White Birch Drive residence, and that one time during that period he conducted surveillance on the Heritage Hotel, which was a known location for his co-defendant, Mr. Tejada. *Id.* at 29; *see also* Doc. 66, p. 5. Agent Gunning testified that he chose not to knock on the doors of either of those locations due to his tactical decision to conduct the investigation covertly. *Id.* at 29–30. Agent Gunning did not see Defendant on any of these visits. *Id.* at 30. However, on one of the visits to 135 White Birch Drive, Agent Gunning did speak with a neighbor, who stated that he had not seen Defendant in a long time. *Id.* at 33–34.

In April 2010, Agent Gunning became the case agent for a large-scale firearms trafficking investigation which required all-day surveillance for a three-and-a-half month period of time and travel throughout Central and South Florida. *Id.* at 31. Agent Gunning testified that with the responsibilities of the new investigation, he did not have "all my time to attempt to find[] [Defendant] when we don't have what we consider active information that we can go on to try to develop more leads based on the information that we have." *Id.* at 31–32. Agent Gunning admitted that, given his other larger responsibilities, Defendant's case was moved "lower on the priority list" for approximately two years. *Id.* at 45.

In 2011, Agent Gunning entered Defendant's information into the Treasury Enforcement Communications System ("TECS"), which is a database that alerts U.S. Customs and Border Protection officers when an individual who is crossing a U.S. border has an outstanding arrest warrant. *Id.* at 32–33. However, Agent Gunning did not receive an alert from TECS that Defendant had been stopped or apprehended. *Id.* at 33. Also in 2011, Agent Gunning utilized the ATF's NCIC checklist, which is an internal document that ATF agents use to update

information pertaining to the status of a missing suspect. *Id.* at 34. As part of this update, Agent Gunning conducted another review of the NCIC and Accurint databases and another wage and earnings evaluation, but these checks provided no new information as to Defendant's location. *Id.* at 34–35. Also in 2011, Agent Gunning conducted a search of Florida's Driver and Vehicle Information Database ("DAVID"), which provides information on state-issued driver's licenses and identification cards. *Id.* at 35. The search revealed only the 135 White Birch Drive address with respect to Defendant. *Id.*

On November 5, 2012, the Court issued its Order to Show Cause directing the Government to show cause why the case should not be dismissed for lack of prosecution. *See* Doc. 52. On November 16, 2012, the Government filed its Fugitive Status Report stating that the ATF had learned new information earlier that month regarding a potential location of Defendant. Doc. 53, ¶ 3. This new information was apparently the result of an updated search of the DAVID database on November 7, 2012, two days after the Court's entry of its Order to Show Cause. *See* Tr. 36; Doc. 66, p. 6. The updated search revealed that Defendant's state-issued identification card had been updated in January 2012 and that it listed a new address for Defendant on Boggy Creek Road in the Orlando area. Tr. 36.

Agent Gunning testified that on two occasions in January and February of 2013, he visited the Boggy Creek Road address to conduct surveillance, but he did not see Defendant. *Id.* Agent Gunning did not knock on the door of the residence due to his decision to conduct the investigation covertly. *Id.* at 36–37. On February 13, 2013, Agent Gunning visited the Boggy Creek Road address a third time, and this time he saw Defendant on the front yard and arrested him. *Id.* at 36. Agent Gunning testified that Defendant told investigators that he had been staying with his brother at the Heritage Hotel at the time of the straw purchase. *Id.* at 37.

Ms. Perez testified that she operates a missionary home, which houses approximately twenty-five homeless people, and that she works with the homeless, helping find them employment. *Id.* at 65. Ms. Perez testified that she knows Defendant through his late step-father, who was a church pastor, and that she knows and has been in contact with Defendant's mother. *Id.* at 66, 69, 76–77. Ms. Perez further stated that she has a current phone number for Defendant's mother, although Defendant's mother changes her phone number often, and that she does not have a current address for Defendant's mother because she moves frequently. *Id.* at 69, 76–77. Ms. Perez then stated that on December 28, 2009, Defendant arrived at the missionary home in need of help. *Id.* at 66. She testified that Defendant was homeless and that he had previously been living with his brother. *Id.* at 66, 74. Defendant has resided at the missionary home since that time. *Id.* at 74. He works around the missionary home, doing household chores and caring for the yard and animals on the property. *Id.* at 66–67.

Ms. Perez testified that in 2010, she accompanied Defendant to United Temp Services, a temporary staffing agency in Kissimmee, Florida, where she helped him complete a job application. *Id.* at 72, 82. After Defendant successfully passed a background check, he was hired for temporary work at the Orange County Convention Center, a job that lasted three weeks. *Id*. Ms. Perez stated that Defendant was paid by check, which he cashed. *Id.* at 72.

Ms. Perez also testified that she helped Defendant successfully apply for Medicaid, which pays for Defendant's medication, in 2010, and that she takes him to a clinic for mental health treatment every month. *Id.* at 68–69. Ms. Perez stated that Defendant "goes everywhere" with her. *Id.* at 70. Ms. Perez testified that Defendant accompanies her when they feed the homeless on Sundays and that law enforcement officers are sometimes present during the meals. *Id*. Ms. Perez further testified that approximately five months prior to the evidentiary hearing, her

vehicle was stopped by a law enforcement officer while Defendant was in the vehicle. *Id.* at 71, 79. Ms. Perez stated that Defendant provided the law enforcement officer with his Florida-issued identification card, which displayed his current address, without incident. *Id.* at 71.

After the evidentiary hearing, Magistrate Judge Kelly issued the Report and Recommendation, recommending that the Court grant Defendant's Motion to Dismiss because, under the circumstances, the (approximately) four-year delay between the indictment and trial[5] violated Defendant's right to a speedy trial under the Sixth Amendment. *See* Doc. 80. The Government's Objections followed. *See* Doc. 85.

## II.     STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations issued by a Magistrate Judge, the district judge may accept, reject, or modify, in whole or in part, the Magistrate Judge's Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982), *cert. denied*, 459 U.S. 1112 (1983). A district judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C); *U.S. v. Raddatz,* 447 U.S. 667 (1980); *see also* Fed. R. Crim. P. 59(b). This determination requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citations omitted).

## III.    DISCUSSION

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U.S. Const. amend. VI. In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court established a four-

---

[5] Trial is set for the term beginning July 1, 2013. *See* Doc. 89.

factor test to determine when a defendant's Sixth Amendment right to a speedy trial has been violated.  The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant.  *Id.* at 530.  The Eleventh Circuit has explained the *Barker* test as follows:

> "[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay. . . ."  *Doggett v. United States*, 505 U.S. 647, 651–52, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520 (1992) (citing *Barker*, 407 U.S. at 530–31, 92 S.Ct. at 2192).  "Only if this threshold point is satisfied may the court proceed with the final three factors in the *Barker* analysis."  *Clark*, 83 F.3d at 1352.   Delays exceeding one year are generally found to be "presumptively prejudicial."  *Doggett*, 505 U.S. at 652 n.1, 112 S.Ct. at 2691 n.1; *see also Clark*, 83 F.3d at 1352.  If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial.  *Doggett*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520.

*United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).

In its Objections, the Government makes the following arguments:  (1) the Magistrate Judge's recommendations to weigh the first three *Barker* factors "heavily" against the Government are unsupported; (2) the Magistrate Judge's findings that the Government's efforts to locate and apprehend the defendant were "very limited" and "sporadic," and that the Government showed a lack of diligence and was negligent in those efforts, are contrary to the evidence; (3) due to his incorrect weighing of the first three *Barker* factors, the Magistrate Judge wrongly concluded that Defendant was not required to demonstrate actual prejudice (the fourth *Barker* factor); and (4) Defendant cannot show actual prejudice from the delay in his apprehension, as he is required to do.  *See* Doc. 85.  These arguments are addressed in the Court's analysis of the *Barker* factors below.

A.        **Length of the Delay**

The Court turns to the first *Barker* factor, the length of the delay.  The Eleventh Circuit

has explained that the first factor of the balancing test actually serves as a "double enquiry":

> First, it serves as a threshold inquiry that the defendant must satisfy in order for us
> to weigh the remaining three factors.  *See Barker*, 407 U.S. at 530, 92 S.Ct. 2182
> ("Until there is some delay which is presumptively prejudicial, there is no
> necessity for inquiry into the other factors that go into the balance.").  To satisfy
> this threshold inquiry the defendant " 'must allege that the interval between
> accusation and trial has crossed the threshold dividing ordinary from
> "presumptively prejudicial" delay.' "  *Ingram*, 446 F.3d at 1336 (quoting *Doggett*,
> 505 U.S. at 651–52, 112 S.Ct. 2686).  If, and only if, the defendant satisfies this
> threshold inquiry will [the Court] proceed to address the remaining three factors
> of the *Barker* balancing test.  *Id*.
>
> The second part of our inquiry under this factor examines "the extent to which the
> delay stretches beyond the bare minimum needed" to satisfy the threshold
> showing of presumptive prejudice.  *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686.
> The longer the pretrial delay extended beyond the "bare minimum" necessary to
> show presumptive prejudice, the stronger the presumption that the pretrial delay
> prejudiced the defendant.  *See id*. at 652, 655–57, 112 S.Ct. 2686.  The length of
> the delay itself weighs against the government, incrementally increasing in weight
> as the delay becomes increasingly protracted, and a particularly lengthy delay
> may also affect the Court's] analysis of the fourth *Barker* factor.  *See id*.; *see also
> United States v. Smith*, 94 F.3d 204, 209 (6th Cir. 1996) ("[I]f the constitutional
> inquiry has been triggered, the length of delay is itself balanced with the other
> factors and may, in extreme circumstances, give rise to a strong presumption of
> evidentiary prejudice affecting the fourth *Barker* factor.") (quotations omitted).

*United States v. Villarreal*, 613 F.3d 1344, 1350 (11th Cir. 2010).

To resolve this "double enquiry," the Court must first determine the length of the pretrial

delay.  *See id*.  To do so, the Court "calculate[s] the time that elapsed between when the Sixth

Amendment right attached until trial (or, until the pretrial motion to dismiss on this ground is

determined)."  *Id*. (internal citations and quotations omitted).  Defendant's speedy trial right

attached upon his indictment on July 22, 2009.  *See id*. (holding that the defendant's speedy trial

right attached on the date of his indictment).  As the Court is ruling on the Motion to Dismiss in

June 2013, with trial set for July 2013, the delay has been approximately four years.

As the Magistrate Judge correctly noted, the Government has conceded that this four-year delay is "presumptively prejudicial."   Doc. 80, p. 8; *see* Doc. 66, p. 8; Doc. 85, p. 4; Tr. 5; *Ingram*, 446 F.3d at 1336 ("Delays exceeding one year are generally found to be 'presumptively prejudicial.'").   Therefore, the Court must proceed with the *Barker* test, and continues to the second part of the "double enquiry" under the first *Barker* factor.

In the second part of the "double enquiry," the Court must determine how heavily to weigh the length of the delay against the Government.   *See Villarreal*, 613 F.3d at 1350. Although the Court may only consider the *post*-indictment delay in the first part of the enquiry, "once the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate *pre*-indictment delay in determining how heavily post-indictment delay weighs against the Government." *Ingram*, 446 F.3d at 1339 (emphasis added).   Thus, in *Ingram*, the Eleventh Circuit found that, given the two-and-a-half year *pre*-indictment delay, a two-year *post*-indictment delay "weigh[ed] more heavily than a two-year delay in another case might if, in that case, the post-indictment delay began shortly after the allegedly criminal acts occurred." *Id.*

Here, the post-indictment delay was four years, which is four times the threshold for presuming prejudice.   As the Eleventh Circuit has noted, the longer the post-indictment delay extends beyond the one-year presumption of prejudice, the more heavily the first factor weighs against the Government.   *Villarreal*, 613 F.3d at 1350.   Moreover, there was a *pre*-indictment delay of 20 months, as Defendant was notified about his violation of the law by Agent Blanco in November 2007, but was not indicted until July 2009.   Because of the 20-month pre-indictment delay, the four-year post-indictment delay weighs more heavily against the Government than it otherwise might.   *See id.*   Accordingly, the Court agrees with the Magistrate Judge that the first *Barker* factor weighs heavily against the Government.   *See Ingram*, 446 F.3d at 1339 (finding

that a two-year post-indictment delay, combined with a two-and-a-half year pre-indictment delay, weighs heavily against the Government).

### B.      Reason for the Delay

Turning to the second *Barker* factor, the Government bears the burden of establishing valid reasons for the delay.  *Villarreal*, 613 F.3d at 1351.  The Court allocates different weight to different reasons for the delay:  (1) "[a] deliberate attempt to delay the trial in order to hamper the defense [is] weighted heavily against the government"; (2) "[a] more neutral reason such as negligence or overcrowded courts [is] weighted less heavily [against the government] but nevertheless [is] considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant"; and (3) "a valid reason, such as a missing witness, ... serve[s] to justify appropriate delay."  *Id.* (quoting *Barker*, 407 U.S. at 531).  "[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay."  *Ingram*, 446 F.3d at 1337.  On the other hand, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith."  *Villarreal*, 613 F.3d at 1351.

In its response to Defendant's Motion to Dismiss and at the evidentiary hearing, the Government asserted that the reason for the delay in this case falls somewhere between a neutral reason due to negligence on the part of the Government and a valid reason due to Defendant's "evasive" tactics.  *See* Doc. 66, p. 8; Tr. 86.  Thus, the Government argued that the second *Barker* factor should not weigh heavily against the Government.  *See* Doc. 66, p. 8; Tr. 93.  The Magistrate Judge disagreed, finding that:  (1) there was no direct evidence of intentional evasion by Defendant (which the Government conceded at the evidentiary hearing, *see* Tr. 5); (2) the Government's pursuit of Defendant was a "low priority"; (3) the Government's efforts to locate Defendant were "very limited" and "sporadic"; and (4) the Government was "negligent" in

bringing Defendant to trial due to its "lack of diligence." Doc. 80, p. 10. In its Objections, the Government argues that the last two findings are "contrary to the evidence." Doc. 85, pp. 1–2.

Upon review, the Court concludes that the Magistrate Judge's findings are well-supported by the evidence. In the 40-month span between Defendant's indictment in July 2009 and this Court's Order to Show Cause in November 2012, the Government's efforts to apprehend him consisted of: a series of unanswered phone calls to Defendant by Agents Blanco and Gunning, none of which were made after November 2009; a single outreach to the ATF's Puerto Rico office in November 2009; four surveillances of the 135 White Birch Drive residence and one surveillance of the Heritage Hotel, all of which occurred between January 2010 and April 2010; and a handful of intermittent queries on various databases. *See supra*, Part I. Indeed, the Government conceded that Defendant's case was moved "lower on the priority list" for approximately two years beginning in April 2010 when Agent Gunning became the case agent on a large-scale firearms trafficking investigation. Tr. 31–32, 45. From this point in time through November 2012, there were no attempts to locate Defendant aside from some routine database checks. *See supra*, Part I. This is ample evidence to support the Magistrate Judge's finding that the Government's efforts to locate Defendant were "very limited" and "sporadic." *See* Doc. 80, p. 10.

The Magistrate Judge's findings of negligence and lack of diligence are particularly appropriate in light of the fact that two days after the Court's Order to Show Cause, the Government conducted an updated search of the DAVID database and discovered that Defendant had updated his address on his state-issued identification card in January 2012. *See* Tr. 36; Doc. 66, p. 6. Had the Government simply done a quick search of the DAVID database at any time between January 2012 and November 2012, it would have discovered that Defendant had

updated his address.  Instead, the Government took no action for a period between 2011 and November 2012 (and little action before then), and was spurred to action only upon the Court's Order to Show Cause.  Accordingly, the Court concludes that the Magistrate Judge's findings of negligence and lack of diligence by the Government are well-supported by the evidence.  *See Ingram*, 446 F.3d at 1338–39 (finding that the Government was negligent and failed to perform its investigation diligently due to its "feeble" efforts consisting of several phone calls and surveillances).

The Court also agrees with the Magistrate Judge's recommendation that the second *Barker* factor weighs against the Government.  *See* Doc. 80, p. 11.  In *Ingram*, an ATF agent interviewed the defendant regarding possible false statements on a Form 4473 in connection with a firearm purchase.  446 F.3d at 1335.  After they exchanged contact information, the defendant and the agent did not speak again until four years later, when the agent informed the defendant that an indictment had been filed against him nearly two years prior.  *Id*.  Although the agent had left voice messages on the defendant's phone, the agent did not specify why he was calling, and when the defendant did attempt to return one of those messages, the agent did not pick up.  *Id*. Based on this information, the Eleventh Circuit determined that there was no evidence that the defendant knew of the indictment or the arrest warrant at any time during the two years preceding his arrest.  *Id*. at 1337.  The *Ingram* Court further concluded that there was no evidence that the defendant even suspected that the ATF agent planned on arresting him.  *Id*.  As the *Ingram* Court observed, the defendant's offense was a nonviolent crime, he had not spoken with the agent in four years, and the voice messages left by the agent did not explain why he was calling.  *Id*. at 1337–38.  In addition, the Court found that "[t]he fact that the phone numbers [the defendant] gave [the agent] were no longer valid two and one-half years later and the fact that

[the defendant] did not return messages [the agent] left for him at work do not support a finding that [the defendant] intended to evade arrest, particularly where there is no evidence [the defendant] was cognizant of the pending charges." *Id*.   Accordingly, the Eleventh Circuit concluded that the district court had clearly erred in holding the defendant culpable for part of the delay.  *Id*.   As such, the *Ingram* Court weighed the second *Barker* factor against the Government.  *Id*.

Here, like in *Ingram*, the Government has presented no evidence that Defendant knew of the indictment or the arrest warrant at any time during the three-and-a-half years preceding his arrest.  Indeed, the Government has conceded this point.  Tr. 5.  Moreover, there is no evidence that Defendant even suspected that an ATF agent planned on arresting him.  Agent Blanco spoke with Defendant about his use of Form 4473 to make a straw purchase in November 2007.  Tr. 54–55.  In February 2008, Agent Blanco again met with Defendant to personally serve him with the notice of forfeiture.  *Id.* at 57.  The notice of forfeiture did not advise Defendant that he may be charged with a crime, but merely provided information as to how Defendant could make a claim for the firearms and ammunition subject to forfeiture.  *Id.* at 17–18, 38–39.  For the next five years ending with his arrest in February 2013, an ATF agent did not speak again with Defendant.  *Id.* at 36.  After having no contact with an ATF agent for five years following his initial interviews with Agent Blanco regarding a nonviolent offense, there was simply no reason for Defendant to suspect that he was going to be arrested or charged.  *See Ingram*, 446 F.3d at 1337–38.  Accordingly, Defendant should not be held culpable for the delay.  *See id*.

In its attempt to assign culpability to Defendant, the Government argues that *Villareal* is analogous.  *See* Doc. 85, p. 10–11.  The Court disagrees.  In *Villareal*, the Eleventh Circuit affirmed the district court's finding that the defendant made "substantial efforts" to evade police,

based on the fact that the defendant had fled from Texas to Mexico immediately after his indictment. 613 F.3d at 1351–53. Here, by contrast, the record is utterly devoid of any evidence of intentional evasion. *See supra*. Rather, it is clear that the delay was due to the Government's decision to make the case a low priority for two years. As the delay in this case was due to the Government's negligence and lack of diligence rather than any evasive efforts by Defendant, the Court agrees with the Magistrate Judge that the second *Barker* factor should be weighed against the Government.

Having made this determination, the Court must now decide how heavily to weigh the second *Barker* factor against the Government. "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." *Doggett*, 505 U.S. at 657. Moreover, while a "deliberate attempt to delay the trial in order to hamper the defense [is] weighted heavily against the government," *Villarreal*, 613 F.3d at 1351, a defendant need not show bad faith by the Government for the second *Barker* factor to be weighed heavily against it. *See Ingram*, 446 F.3d at 1339–40. In *Ingram*, the Eleventh Circuit did not disturb the district court's finding that the Government had conducted its investigation in good faith, but the Court still weighed the second *Barker* factor heavily against the Government due to the Government's negligence and lack of diligence. *Id*.

Similarly here, the Court has concluded that there is ample evidence to support the Magistrate Judge's findings of negligence and lack of diligence by the Government. *See supra*. Of particular concern to the Court is the fact that, aside from the minimal efforts made early in

the investigation, the Government made virtually no efforts to locate Defendant after the investigation became a "low priority" in April 2010.  Had the Court not entered its Order to Show Cause in November 2012, it is quite likely that this investigation would have remained dormant for a while longer.  Only upon the Court's entry of the Order to Show Cause did the Government become motivated to conduct a simple query of the DAVID database, which revealed an address change by Defendant that could have been discovered many months earlier.  This is a clear case of negligence, if not gross negligence, by the Government.  Accordingly, the Court agrees with the Magistrate Judge that the second *Barker* factor should be weighed heavily against the Government.  *See Ingram*, 446 F.3d at 1339–40.

### C.      Assertion of the Speedy Trial Right

The Court next considers the third *Barker* factor, whether Defendant asserted his right to a speedy trial.  The Government has conceded that Defendant properly asserted his right to a speedy trial by filing a timely Motion to Dismiss following his initial appearance.  *See* Doc. 66, p. 8.  The Magistrate Judge recommended that this factor be weighed heavily against the Government, *see* Doc. 80, p. 9, and the Government has not objected to this recommendation.  *See* Doc. 85.

The Court agrees that this factor should be weighed heavily against the Government.  As discussed in Part III.B, *supra*, there is no evidence that Defendant knew about the indictment or arrest warrant until his arrest on February 13, 2013.  Five days later, Defendant filed the Motion to Dismiss, arguing that his right to a speedy trial had been violated.  *See* Doc. 63.  Because Defendant made a timely and forceful assertion of his speedy trial right, this factor weighs heavily against the Government.  *See Ingram*, 446 F.3d at 1340 (weighing the third *Barker* factor heavily against the Government where the defendant asserted his speedy trial right three months after learning of the indictment and arrest warrant); *United States v. Taylor*, 306 F. App'x 492,

18

493 (11th Cir. 2009) ("Where the defendant did not know of the indictment until arrest, however, he may promptly assert his right to a speedy trial after arrest, and it weighs heavily against the government.").

The Court has determined that the first three *Barker* factors all weigh heavily against the Government.  Therefore, Defendant need not demonstrate actual prejudice, and the indictment must be dismissed.  *See Ingram*, 446 F.3d at 1340.

## IV.    CONCLUSION

After careful consideration of the Report and Recommendation of the Magistrate Judge, in conjunction with an independent examination of the court file and the transcript of the evidentiary hearing, the Court is of the opinion that the Magistrate Judge's Report and Recommendation should be adopted, confirmed, and approved in all respects.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.    The Report and Recommendation of the Magistrate Judge (Doc. 80) is adopted, confirmed, and approved in all respects and is made a part of this Order for all purposes, including appellate review.

2.    Defendant Luis A. Gonzalez-Castro's Motion to Dismiss the Indictment (Doc. 63) is **GRANTED**.

3.    The Indictment (Doc. 1) against Luis A. Gonzalez-Castro is **DISMISSED.**

**DONE** and **ORDERED** in Orlando, Florida on June 19, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties
United States Magistrate Judge Gregory J. Kelly